This Opinion Is a
Precedent of the TTAB

Hearing: September 29, 2020                    Mailed: February 5, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

____

Trademark Trial and Appeal Board

____

*The United States Olympic Committee*
*v.*
*Tempting Brands Netherlands B.V.*

____

Opposition No. 91233138

____

Susan A. Smith of Ballard Spahr LLP for The United States Olympic Committee[1]

Christopher B. Lay and Dermot J. Horgan of IPHorgan Ltd. for Tempting Brands Netherlands B.V.

____

Before Wellington, Lynch, and Johnson, Administrative Trademark Judges.

Opinion by Lynch, Administrative Trademark Judge:

---

[1] William M. Merone of Hunton Andrews Kurth LLP, who previously also represented The United States Olympic Committee, appeared and argued on its behalf at the oral hearing in this case.

## I. Procedural Background and Evidentiary Record

Tempting Brands Netherlands B.V. ("Applicant") seeks registration on the Principal Register of the stylized word mark **Pierre de Coubertin** for the following goods and services:[2]

> Perfumery, essential oils, cosmetics, hair lotions; dentifrices; cosmetic soaps, soaps for personal use; douching preparations for personal sanitary or deodorant purposes in the nature of toiletries in International Class 3;
>
> Eyeglasses, sunglasses, protective eyewear, sports eyewear, anti-glare glasses, 3D spectacles, binoculars, contact lenses, containers for contact lenses, eyewear cases, cases for spectacles and sunglasses, eyeglass chains, eyeglass cords, frames for spectacles and sunglasses, spectacle lenses, lenses for sunglasses, optical lenses, pince-nez, pince-nez cases, goggles for sports, monocles, magnifying glasses; protective helmets; bags adapted for laptops; sleeves for laptops; protective covers and cases for cell phones; decorative magnets; clothing for protection against accidents; earphones; headphones; electronic equipment in the nature of smartwatches and weighing scales for displaying and or storing data obtained during exercise in International Class 9;
>
> Jewellery and precious stones; horological and chronometric instruments; watches and bracelets also incorporating functions for monitoring and reporting fitness, training, and activity data, namely, time, distance, pace, calories burned, and cumulative activity level; watches and bracelets also communicating data to personal digital assistants, smart phones, and personal computers through internet websites and other computer and electronic communication in International Class 14;

---

[2] Application Serial No. 79185262 is a request for extension of protection under the Madrid Protocol of International Registration No. 1293867, based on Section 66(a) of the Trademark Act, 15 U.S.C. § 1141f. The application record includes a statement that "[t]he name shown in the mark does not identify a particular living individual."

Animal skins; trunks being luggage and travelling bags; umbrellas; parasols and walking sticks; whips and saddlery; bags, namely, handbags, travelling bags, bags for sports, school bags, book bags, reusable shopping bags, leather shopping bags, briefcases and rucksacks; collars for animals; purses, credit card cases, wallets, and pocket wallets; bags in the nature of envelopes of leather, for packaging, and pouches, of leather, for packaging; vanity cases, not fitted; clothing for pets in International 18;

Clothing for men, women and children, namely, socks, stockings, jeans, trousers, breeches for wear, leggings trousers, boxer shorts, combinations, suits, skirts, petticoats, dresses, dressing gowns, blouses, shirts, tee-shirts, sweaters, pullovers, vests, clothing jerseys, cardigans, shawls, scarves, neckties, clothing gloves, clothing belts, suspenders, panties, coats, waistcoats, overcoats, raincoats, parkas, ponchos, pelerines, cloaks, saris, clothing jackets, overalls, pockets for clothing, clothing collars, nightwear, lingerie, underwear, bathing suits, bath robes, masquerade costumes, fur stoles, footwear, headwear in International 25; and

Tennis racquets, baseball bats, cricket bats, golf clubs and hockey sticks; golf balls, golf gloves, golf club grips, golf bags, golf tees, head covers for golf clubs, golf ball markers; sports balls, bags specially adapted for carrying sports equipment and sports balls; table tennis rackets; badminton rackets; skis; skates, namely, hockey skates, ice skates, roller skates; fitness machines and equipment, namely, weights, treadmills, rowing machines, stair-stepping machines, resistance machines, stationary cycles; appliances for gymnastics; swimming jackets in International Class 28.

By its Notice of Opposition, The United States Olympic Committee ("Opposer")

opposes registration of the mark based on an alleged false suggestion of a connection

under Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), with Opposer and "the

Olympic Games as a whole."[3] In its Answer, Applicant denies the salient allegations in the Notice of Opposition, and asserts what it titled as the "affirmative defenses" of "Lack of Standing" and "Failure to State a Claim Upon Which Relief Can Be Granted."[4] These are not true affirmative defenses,[5] and because Applicant raised them in the Answer but did not pursue them at trial, we consider them waived. *See Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1752 n.6 (TTAB 2013); *see also In re Google Tech. Holdings, LLC*, 980 F.3d 858, 2020 USPQ2d 11465 (Fed. Cir. 2020).

The record includes the pleadings and, pursuant to Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the file of the opposed application. Both parties submitted testimony and documents under notices of reliance, including some confidential material that we discuss only in general terms. Both parties also lodged evidentiary objections, although Applicant helpfully notes that ultimately, it "requests that the Board simply exercise its customary review of such evidence by assigning appropriate weight."[6] Opposer objects to testimony on subjects for which the witness, Applicant's

---

[3] 1 TTABVUE 4. Except where otherwise indicated, citations refer to TTABVUE, the Board's online docketing system.

[4] 4 TTABVUE.

[5] Failure to state a claim upon which relief must be granted is not an affirmative defense. *John W. Carson Found. v. Toilets.com, Inc.*, 94 USPQ2d 1942, 1949 (TTAB 2010) ("The asserted defense of failure to state a claim is not a true affirmative defense because it relates to an assertion of the insufficiency of the pleading of opposer's claim rather than a statement of a defense to a properly pleaded claim."). Lack of standing also is not an affirmative defense. Opposer must prove its entitlement to the statutory cause of action at issue (here, an opposition proceeding under 15 U.S.C. § 1063) as a part of its claim, *see Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014), so this issue is addressed in that context.

[6] 70 TTABVUE 41.

Director of Global Licensing, Mr. Van Dijk, allegedly lacks personal knowledge, and Opposer objects to testimony and evidence on grounds of hearsay. With these types of objections, the Board is capable of assessing the proper evidentiary weight to be accorded the testimony and evidence, taking into account the concerns raised by the objections. We have considered all of the testimony and evidence submitted for the record. In doing so, we bear in mind both parties' objections and accord whatever probative value the evidence merits. *See Pierce-Arrow Soc'y v. Spintek Filtration, Inc.*, 2019 USPQ2d 471774, at \*8-\*9 (TTAB 2019); *Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 USPQ2d 1477, 1479 (TTAB 2017); *Poly-America, L.P. v. Ill. Tool Works Inc.*, 124 USPQ2d 1508, 1510 (TTAB 2017).

We note that Opposer failed to cite to TTABVUE docket entries in its briefs. Opposer instead generally cited to evidence by document title and page or paragraph number, or transcript page number. This citation convention renders it more difficult for the Board and other readers to find the cited evidence. We therefore reiterate the guidance in TBMP § 801.01 (2020), "[t]o allow readers [of briefs] to easily locate materials in the record, the parties should cite to the evidence in the trial record by referencing the TTABVUE entry and page number," and in *Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014):

> Because the Board primarily uses TTABVUE in reviewing evidence, the Board prefers that citations to material or testimony in the record that has not been designated confidential include the TTABVUE docket entry number and the TTABVUE page number. For material or testimony that has been designated confidential and which does not appear on TTABVUE, the TTABVUE docket entry

number where such material or testimony is located should be included in any citation.

## II. Applicant's Request for Reconsideration of the Board's June 22, 2017 Order

Early in the proceeding, Opposer filed a Motion for Leave to File an Amended Notice of Opposition to add a claim of lack of bona fide intent to use the mark. Applicant responded and pointed out that an applicable rule and Board precedent applying it foreclose amending an opposition against an application such as this one, filed under Section 66(a).[7] *See* 37 C.F.R. § 2.107(b). Opposer subsequently withdrew the motion to amend, but stated that it "reserve[d] the right to assert the withdrawn claims in any further proceedings that may arise subsequent to the resolution of this Opposition."[8] The Board issued an order on June 22, 2017 noting the motion to amend, response, and withdrawal of the motion, and stating that in view of the withdrawal, the motion would "be given no further consideration."[9]

In its Brief filed May 13, 2020, Applicant concludes with a request that the Board "exercise its inherent authority to first deny Opposer's withdrawal of the motion to amend and then dismiss it with prejudice."[10] Pursuant to Trademark Rule 2.127(b), "[a]ny request for reconsideration or modification of an order or decision issued on a motion must be filed within one month from the date thereof." Trademark Rule 2.127(b), 37 C.F.R. § 2.127(b). Applicant's request related to the June 22, 2017 order

---

[7] 7 TTABVUE 3-4.

[8] 8 TTABVUE 2.

[9] 9 TTABVUE.

[10] 69 TTABVUE 38.

is untimely, and we decline to reconsider the June 22, 2017 order, or to take other action regarding the withdrawn motion to amend.

## III.   Factual Background

### A.  Pierre de Coubertin

The parties agree that Pierre de Coubertin is the name of a French baron who lived in Europe and died in 1937. Neither party has acquired rights to the name "Pierre de Coubertin" from or through his estate.[11]

Pierre de Coubertin was instrumental in reviving the Olympic Games in the late nineteenth century by co-founding the International Olympic Committee and later becoming its president.[12] He designed the Olympic Rings logo, "proposed the Olympic motto *Citius, Altius, Fortius* (Faster, Higher, Stronger)," and created the Olympic Creed that states in part, "[t]he most important thing in the Olympic Games is not to win but to take part, just as the most important thing in life is not the triumph but the struggle."[13] The Olympic Games feature a sportsmanship award given only occasionally, named the Pierre de Coubertin medal,[14] which Time Magazine reports "is also known as the International Fair Play Committee Award,"[15] and Wikipedia

---

[11] 69 TTABVUE 3 (Applicant's Brief); 35 TTABVUE 3, 97 (Opposer's admissions).

[12] 26 TTABVUE 5 (Zeytoonjian Declaration).

[13] 26 TTABVUE 6, 71 (Zeytoonjian Declaration).

[14] 26 TTABVUE 6 (Zeytoonjian Declaration); *see also* 29 TTABVUE Exhibit W.

[15] 26 TTABVUE 42.

reports is "also known as the Coubertin medal or the True Spirit of Sportsmanship medal."[16]

Various articles about the Olympics in media, including some mainstream publications, identify and discuss Pierre de Coubertin's role in establishing the modern Olympic Games,[17] such as the following:

- A May 2008 article in USA Today quotes a sports historian from Purdue University who states that "Even the 1896 revival of the modern-day Olympics, thanks to Frenchman Pierre de Coubertin, had a political agenda."[18]

- A July 28, 2016 Wall Street Journal mentions that the 1948 Olympic "Austerity Games" Opening Ceremony at Wembley Stadium included the display of "a quote from Pierre de Coubertin" of the Olympic Creed.[19]

- A July 22, 2012 Boston Globe review of some books about the Olympics describes how readers would "learn the unlikely, remarkable story of how the ancient games vanished for a couple thousand years, only to make their second debut in 1896, thanks to Baron Pierre de Coubertin, father of the modern Olympics."[20]

---

[16] 28 TTABVUE 12.

[17] *See also, e.g.*, 30 TTABVUE 311-56, 362-72, 377-427, 432-46.

[18] 26 TTABVUE 15.

[19] 26 TTABVUE 17; *see also* 30 TTABVUE 310 (August 5, 2016 Wall Street Journal article referring to "the founder of the modern [Olympic] Games, Pierre de Coubertin").

[20] 26 TTABVUE 22.

- A January 21, 2014 editorial in the Washington Post advocates "ending this corrupt quadrennial exercise" that is the Olympic Games, noting as background that "[t]he modern Olympics were founded by a French aristocrat, Pierre de Coubertin, who believed in promoting international peace and understanding by reviving the ancient Greek custom of periodic truces for athletic competition."[21]

- A March 18, 2017 article in The Economist about the business model for the Olympic Games describes how "Pierre de Coubertin, the French aristocrat who founded the modern Olympics, was seduced by the world's fair."[22]

- A January 26, 2014 article in the San Francisco Chronicle notes that "Baron Pierre de Coubertin, who founded the modern Olympics in 1894, would hardly recognize the sports fest coming in two weeks."[23]

Opposer's "Brand Book" of "brand guidelines [] for internal reference only by the USOC and its partners" introduces the International Olympic Committee with, "In order to develop the Modern Olympic Games, the International Olympic Committee (IOC) was created by Pierre de Coubertin at an International Congress in Paris on June 23, 1894."[24]

As reflected in a video submitted for the record, and according to Mr. Zeytoonjian, Senior Vice President, Commerce & Events, for a joint venture that includes Opposer,

---

[21] 26 TTABVUE 34.

[22] 26 TTABVUE 36.

[23] 30 TTABVUE 315.

[24] 26 TTABVUE 67-68.

"during the Atlanta 1996 Games, Pierre de Coubertin was discussed specifically and his photograph was prominently displayed during the nationwide broadcast of the opening ceremony of the Olympic Games."[25]

### B. Adoption of Applicant's Mark

Applicant, a brand development and licensing company, selected the proposed mark in connection with its development of a clothing brand.[26] Applicant's Director of Global Licensing, Mr. Van Dijk, stated that while brainstorming for a "French-sounding name," they chose "Pierre" as the first name because it is "a quintessential French-sounding first name for men."[27] In selecting the surname, Mr. Van Dijk testified that they "liked the sound of a hard 'k,' following the 'p' sound in 'Pierre,' similar to the sequence of PIERRE CARDIN."[28] While Mr. Van Dijk stated that he "had heard of Pierre de Coubertin and [he] suggested that name as a potential candidate," he and his business associate "did not discuss any potential association of this mark to the Olympic Games or any related entity, and such a potential was not part of our calculation into whether the name was the best choice for our brand."[29] He testified that they selected the name because they liked its sound and look.[30]

---

[25] 26 TTABVUE 6 (Zeytoonjian Declaration).

[26] 38 TTABVUE 4-5.

[27] 38 TTABVUE 4 (Van Dijk Declaration).

[28] 38 TTABVUE 4 (Van Dijk Declaration).

[29] 38 TTABVUE 5 (Van Dijk Declaration).

[30] 38 TTABVUE 4-5 (Van Dijk Declaration).

On cross-examination, Mr. Van Dijk elaborated that "we were looking for good name [sic] starting with Pierre, and I had heard of the saying, participating is more important than winning. And I knew it was from Pierre de Coubertin. And that's why I brought up the name."[31] He further stated, "When I first suggested Pierre de Coubertin's brand name, I knew that he was one of the founders of the IOC, that's what I – basically what I knew in regards to that."[32]

Mr. Van Dijk further testified by declaration that during the selection process, the trademark search yielded no U.S. registrations, but showed three foreign registrations (COUBERTIN) owned by the Fondation de Coubertin, and one European Union (EU) registration (PIERRE DE COUBERTIN) owned by the International Olympic Committee (IOC).[33] He further testified that Applicant searched for and found no evidence of use of these marks.[34] Applicant was "hopeful we could easily come to terms with both parties."[35] Elaborating on cross examination, Mr. Van Dijk stated that because these registrations "would potentially stand in the way" of Applicant's pursuit of the proposed mark, "that's why [Applicant] sent [the IOC] a letter to withdraw their trademark because they were actually not using it, which we also did to the Fondation de Coubertin."[36] Applicant submitted a trademark

---

[31] 66 TTABVUE 27 (Van Dijk Cross-Examination).

[32] 65 TTABVUE 30 (Van Dijk Cross-Examination).

[33] 38 TTABVUE 5 (Van Dijk Declaration).

[34] 38 TTABVUE 6 (Van Dijk Declaration).

[35] 66 TTABVUE 72-73 (Van Dijk Cross-Examination).

[36] 66 TTABVUE 47-48 (Van Dijk Cross-Examination).

application for the mark PIERRE DE COUBERTIN in the Benelux on June 22, 2015, and the application matured to registration on December 21, 2015.[37] At the same time, Applicant pursued an application to register the "acronym [sic] of PDC" shown below, done by a designer who Mr. Van Dijk concedes "clearly was inspired by Pierre de Coubertin":

.[38] However, Applicant later "decided we wanted something else," and Mr. Van Dijk stated that it did not continue its plan to use the initial mark.[39] Opposer submitted a screenshot from Applicant's Twitter feed dating from 2018 that displayed the initials logo along with four other unrelated logos above the text line, "5 brands waiting for your inspiration," in conjunction with a "Design Summer Internship" vacancy announcement.[40]

In October 2015, during the pendency of Applicant's Benelux application, Applicant pursued the revocation of the IOC's and Fondation's registrations for PIERRE DE COUBERTIN and COUBERTIN.[41]

---

[37] 56 TTABVUE 18 (Benelux registration); 38 TTABVUE 6 (Van Dijk Declaration).

[38] 66 TTABVUE 76 (Van Dijk Cross-Examination).

[39] *Id.*

[40] 56 TTABVUE 2, 10 (Kane Declaration).

[41] 38 TTABVUE 8 (Van Dijk Declaration); 66 TTABVUE 65 (Van Dijk Cross-Examination).

Presumably after learning of the revocation proceedings, a March 4, 2016 joint letter from the IOC[42] and the Fondation Coubertin to Applicant included the following assertions:[43]

> On the one hand, Pierre de Coubertin is known worldwide for being the creator of the IOC and for having created the modern Olympic Games. As such, the IOC perpetuates his memory and his legacy through the notorious event that are [sic] the Olympic Games and the values thereof. His name and his image undoubtedly refer, in the mind of the public, to the Olympic Games, their universe and their values. Any commercial exploitation of Pierre de Coubertin's name and/or image is likely to constitute an undue commercial exploitation of Pierre de Coubertin's notoriety and reputation as well as the Olympic Game's [sic] notoriety, thus infringing the IOC's rights, and such practice is likely to engage the liability of whoever does so.
>
> On the other hand, the Fondation and Pierre de Coubertin's heirs, represented by the AFC [Association Familiale Coubertin] which specifically safeguards their ancestor's name and the values and rights attached to the name and image of Pierre de Coubertin, ensure, together with the IOC, that their ancestor's patronym and his memory are not prejudiced, notably by means of uncontrolled commercial exploitation which can harm his dignity and the family's honor. Such commercial exploitation of the name of Pierre de Coubertin would constitute a willful violation of our clients' prior rights to the said name, as well as a blatant violation of the personality rights linked with the name of Pierre de Coubertin. Our clients have consistently preserved the name of its founding ancestor from being commercially exploited outside the scope of the Olympic values without their permission, so as to ensure that the image of, and the

---

[42] Opposer describes itself as "charged and empowered by the International Olympic Committee ("IOC") to promote and protect the Olympic Movement here [the United States]." 67 TTABVUE 13 (Opposer's Brief).

[43] 38 TTABVUE 36-37.

values linked with, Pierre de Coubertin would be respected and kept unharmed.

Subsequently, however, Applicant and the Fondation de Coubertin entered into a confidential Coexistence Agreement dated August 10, 2017, attested to by Mr. Van Dijk, and a copy of which was attached to the confidential version of his declaration.[44] He further testified that "we reached a coexistence agreement, so that was not a fight at all," and "no money was paid to the foundation at all."[45]

However, Applicant did not resolve the dispute with the IOC or Opposer, and as a result of the revocation proceeding pursued by Applicant, the IOC's EU registration subsequently was revoked in its entirety, based on non-use.[46] In response to questioning about why Applicant continued to pursue this mark despite the costs associated with legal actions including the revocation proceedings and this opposition, Mr. Van Dijk stated that they were "surprised" by the opposition and "when you're attacked and you don't expect it and you think you're attacked unfairly, then also other motives start to kick in than just business reasons…."[47]

---

[44] 39 TTABVUE 5-9; 66 TTABVUE 67-69 (Van Dijk Cross-Examination); *see also* 65 TTABVUE 50 (Confidential Van Dijk Cross-Examination).

[45] 66 TTABVUE 68-69 (Van Dijk Cross-Examination).

[46] 38 TTABVUE 41-52 (concluding that the IOC "has not proven genuine use of the contested EUTM for any of the goods and services for which it is registered").

[47] 66 TTABVUE 71 (Van Dijk Cross-Examination).

## IV.    Entitlement to a Statutory Cause of Action[48]

Entitlement to a statutory cause of action is a threshold issue in every inter partes case. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26, 109 USPQ2d 2061, 2067 n.4 (2014)). A party in the position of plaintiff may oppose registration of a mark when such opposition is within the zone of interests protected by the statute, 15 U.S.C. § 1063, and the plaintiff has a reasonable belief in damage that is proximately caused by registration of the mark. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at * 6-7 (Fed. Cir. 2020).

Opposer relies on its status as "part of the 'institution' to which use of the PIERRE DE COUBERTIN mark would falsely suggest a connection – *i.e.*, the Olympic Movement."[49] We find that the record in this case supports the finding previously made by the Board in *In re Urbano* that "the entire organization which comprises the Olympic Games, as a whole, qualifies as an 'institution' within the meaning of Section 2(a) of the Trademark Act." 51 USPQ2d 1776, 1779 (TTAB 1999). Opposer established that the IOC's Olympic merchandise retail website features a "Pierre de Coubertin's Moustache T-Shirt" with a price shown in Swiss francs and a product description that

---

[48] Board decisions have previously analyzed the requirements of Sections 13 and 14 of the Trademark Act, 15 U.S.C. §§ 1063-64, under the rubric of "standing." Despite the change in nomenclature, the substance of our analysis of this issue in our prior decisions and those of the Federal Circuit interpreting Sections 13 and 14 remain equally applicable. *See Spanishtown Enters., Inc. v. Transcend Resources, Inc.*, 2020 USPQ2d 11388, at *2 (TTAB 2020).

[49] 67 TTABVUE 28 (Opposer's Brief).

includes the explanation, "Pierre de Coubertin was the founder of the modern Olympic Movement."[50] Presumably to establish that the IOC would sell the shirt to a U.S. consumer, Opposer's counsel purchased one such shirt and had it shipped to him in the U.S.[51] On the front, the shirt contains four drawings of moustaches with ranges of years underneath, and on the back, the shirt bears an image of the late individual, with "Coubertin" in cursive font underneath.[52] Opposer and its licensees also sell "most of the goods" in the opposed application, albeit under other marks.[53] To further establish the requisite interest and belief, Opposer relies on the evidence that the IOC awards an occasional Olympic Games sportsmanship medal bearing Pierre de Coubertin's name,[54] that the 1996 Olympic Games opening trailer includes mention of Pierre de Coubertin,[55] and that Centennial Olympic Park in Atlanta, Georgia features a monument honoring Pierre de Coubertin.[56]

We find that the record, including evidence of IOC sales of a shirt bearing the Coubertin name and image of Pierre de Coubertin, Opposer's sale of competing goods under other marks, and the commemoration of Pierre de Coubertin's role in the Olympics at Olympic events and venues, sufficiently shows that Opposer's opposition

---

[50] 29 TTABVUE 267-73 (Olympic retail website offering the t-shirt, with the price shown in Swiss francs).

[51] 28 TTABVUE 9, 274-75 (Kane Declaration).

[52] *Id.* at 274-75.

[53] 26 TTABVUE 7-11 (Zeytoonjian Declaration).

[54] 26 TTABVUE 6 (Zeytoonjian Declaration).

[55] 26 TTABVUE 6 & Exhibit B (Zeytoonjian Declaration).

[56] 26 TTABVUE 6 (Zeytoonjian Declaration).

to registration of the mark is within the zone of interests protected by the statute, and Opposer has a reasonable belief of damage that is proximately caused by registration of the mark. *See, e.g.*, *Australian Therapeutic Supplies*, 2020 USPQ2d 10837, at *4 (An opposer may "demonstrate a real interest and reasonable belief of damage by producing and selling merchandise bearing the [proposed] mark.") (citing *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000) and *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1091 (Fed. Cir. 1984)). We therefore conclude that Opposer has proven its entitlement to this opposition proceeding.

## V.    False Suggestion of a Connection

Section 2(a) of the Trademark Act prohibits registration of a mark that consists of or comprises matter that may falsely suggest a connection with an institution. 15 U.S.C. § 1052(a). This statutory provision "evolved from the rights of privacy and publicity, and was intended to preclude registration of a mark that conflicts with another's rights in one's persona or identity." *Pierce-Arrow Society*, 2019 USPQ2d 471774, at *13 (citations omitted). The elements of a false suggestion of connection claim are:

> 1. The mark is the same as, or a close approximation of, the name or identity previously used by another person or institution;
>
> 2. The mark would be recognized as such, in that it points uniquely and unmistakably to that person or institution;
>
> 3. The person or institution named by the mark is not connected with the activities performed by the applicant under the mark; and

4. The fame or reputation of the person or institution is such that, when the mark is used with the applicant's goods or services, a connection with the person or institution would be presumed.

*Id.* at *14; *see also Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imps. Co.*, 703 F.2d 1372, 217 USPQ 505, 508-10 (Fed. Cir. 1983) (providing foundational principles for the current four-part test used by the Board to determine the existence of a false connection).

In *Univ. of Notre Dame*, 217 USPQ at 509, the Federal Circuit set out additional background on this provision of Section 2(a) that provides helpful guidance in this case:

> Under concepts of the protection of one's "identity," in any of the forms which have so far been recognized, the initial and critical requirement is that the name (or an equivalent thereof) claimed to be appropriated by another must be unmistakably associated with a particular personality or "persona."
>
> As stated by Professor Prosser:
>
>> It is in this sense that "appropriation" must be understood. It is therefore not enough that a name which is the same as the plaintiff's is used in a novel, or the title of a corporation, unless the context or the circumstances indicate that the name is that of the plaintiff. [Footnotes omitted.]
>
> W. PROSSER, HANDBOOK OF THE LAW OF TORTS at 805-06 (4th ed. 1971). Thus, to show an invasion of one's "persona," it is not sufficient to show merely prior identification with the name adopted by another. Nor is it sufficient, as urged by the University, that the fame of the name of an institution provides the basis for protection in itself. The mark NOTRE DAME, as used by Gourmet, must point uniquely to the University.

As the board noted, "Notre Dame" is not a name solely associated with the University. It serves to identify a famous and sacred religious figure and is used in the names of churches dedicated to Notre Dame, such as the Cathedral of Notre Dame in Paris, France. Thus, it cannot be said that the only "person" which the name possibly identifies is the University and that the mere use of NOTRE DAME by another appropriates its identity. (*See FBI v. Societe M. Bril & Co.*, 187 USPQ 685, 687 (D.D.C. 1975), where the court indicates that § 2(a) may preclude registration where "the mark by its very nature falsely suggests a connection.") This conclusion could be changed if the evidence showed that Gourmet intended to identify the University, as the University argues. Evidence of such intent would be highly persuasive that the public will make the intended false association.

### C. Whether PIERRE DE COUBERTIN Is Opposer's Name or Identity, or a Close Approximation Thereof

"Opposer's Section 2(a) claim requires proof … that consumers view [PIERRE DE COUBERTIN] so closely with Opposer that they recognize it as Opposer's name (or nickname), identity or persona." *Bos. Athletic Ass'n v. Velocity, LLC*, 117 USPQ2d 1492, 1497 (TTAB 2015). "[A]n opposer in a proceeding of this character may prevail even if the name claimed to be appropriated has never been commercially exploited by the opposer in a trademark or trademark analogous manner." *Buffett v. Chi-Chi's, Inc.*, 226 USPQ 428, 429 (TTAB 1985). However, the opposer must have publicly used or promoted the name as a means of identifying itself. *See Bd. of Trs. of Univ. of Ala. v. Pitts*, 107 USPQ2d 2001, 2026 (TTAB 2013) (vacated pursuant to settlement on appeal); *Bos. Athletic Ass'n*, 117 USPQ2d at 1497 (must be the "recognized name or identity" of the opposer). "Applicant's mark must do more than simply bring Opposer's name to mind." *Pierce-Arrow Soc'y*, 2019 USPQ2d 471774, at *15 (citations

omitted). "[T]he similarity required for a 'close approximation' … is more than merely 'intended to refer' or 'intended to evoke.'" *Bos. Athletic Ass'n*, 117 USPQ2d at 1497 (citation omitted).

In its Brief, Opposer glosses over this prong of the test by asserting that "[t]here is no dispute here that the mark (PIERRE DE COUBERTIN) and asserted name are **identical**. Thus, the only question is whether any of the entities that comprise the 'institution' behind the Olympics used the PIERRE DE COUBERTIN name before Applicant's filing date."[57] However, while the mark matches the name or identity Opposer asserts in this proceeding, the crux of the dispute under this prong focuses on whether the term in Applicant's mark, "Pierre de Coubertin," qualifies as Opposer's "name or identity," or a close approximation thereof. The legislative history of the Section 2(a) false suggestion claim, discussed above, and prior precedent make clear that "[t]he statutory false suggestion of a connection refusal emerged from the right to privacy and right of publicity." *In re Nieves & Nieves LLC*, 113 USPQ2d 1639, 1643 (TTAB 2015). If "Pierre de Coubertin" is not Opposer's name or identity, or close to it, Opposer has no claim to any associated right of privacy and right of publicity, and has no meritorious Section 2(a) false suggestion claim.

Pierre de Coubertin is the name and identity of a historical person, and as discussed in more detail below, the record shows that one or more organizations (Fondation de Coubertin and Association Familiale Coubertin) hold themselves out as existing to preserve and protect the publicity rights associated with his name.

---

[57] 67 TTABVUE 35.

While Pierre de Coubertin certainly was associated with the Olympic Movement, this record does not demonstrate that the public would perceive Applicant's mark as a name or identity of the Olympic Movement or Opposer, or a close approximation thereof. Thus, this mark differs from the SYDNEY 2000 mark at issue in *Urbano*, about which the Board stated, "we have no doubt that the general public in the United States would recognize this phrase as referring unambiguously to the upcoming Olympic Games in Sydney, Australia, in the year 2000." *Urbano*, 113 USPQ2d at 1644.

Here, Opposer has admitted that it "does not use 'Pierre de Coubertin' interchangeably with 'Olympic Games' as a name for the Olympic Games."[58] Opposer also admitted that the name was not mentioned in the 2016 USOC Annual report, did not appear in the "'U.S. Olympic and Paralympic Brand Usage Guidelines' page of the teamusa.org website as of the date of service of these Requests for Admission," and is not included as one of the specific designations listed in the Ted Stevens Olympic and Amateur Sports Act, which gives Opposer special statutory exclusive rights to certain specified Olympic-related designations in the U.S.[59]

However, Opposer asserts that "the record contains numerous examples of how the U.S. Olympic Committee and others in the Olympic Movement (including the IOC) have used, honored, and publicized the PIERRE DE COUBERTIN name over

[58] 35 TTABVUE 103 (Opposer's Response to Request for Admission No. 26).

[59] 35 TTABVUE 105 (Opposer's Responses to Request for Admission Nos. 30-32); *see also* 36 U.S.C. § 220506(a) (giving Opposer the exclusive right to use, inter alia, "the words 'Olympic', 'Olympiad', 'Citius Altius Fortius', 'Paralympic', 'Paralympiad', 'Pan-American', 'America Espirito Sport Fraternite', or any combination of those words").

the years."[60] However, mere use of a term does not equate to establishing the term as Opposer's name or identity. *See In re Kayser-Roth Corp.*, 29 USPQ2d 1379, 1385 (TTAB 1993) ("It is our opinion that OLYMPIC CHAMPION is not a close approximation of the name or identity of the United States Olympic Committee, but, that they are in fact different."). We find that the nature of Opposer's use, honoring, and publicizing does not rise to the level of establishing PIERRE DE COUBERTIN as the name or identity of Opposer or the Olympic Movement, or a close approximation of it. Rather, we find that Opposer's activities reflect a more limited interest in educating the public about the historical role of Pierre de Coubertin in reviving the Olympic Games in the late 1800's and in celebrating his legacy.[61] Even where the IOC has featured Pierre de Coubertin's name or likeness on merchandise such as the moustache-themed t-shirt purchased by Opposer's counsel, such use emphasizes him as a person and does not show that PIERRE DE COUBERTIN would be recognized as the name or identity of Opposer or the Olympic Movement.

Opposer also contends that "the media have picked up on and acknowledged the connection between the PIERRE DE COUBERTIN name and the Olympics, including by bestowing on Pierre de Coubertin the title 'father' of the modern Olympic

---

[60] 67 TTABVUE 35 (Opposer's Brief).

[61] Opposer urges us to rely on "mentions of 'Pierre de Coubertin' at Olympic Games held outside the United States" that are not televised in the U.S. and "foreign tributes to M. de Coubertin … especially those which are located in tourist areas." 67 TTABVUE 35 n.7 (Opposer's Brief). However, this urging is notably devoid of citations to the record that demonstrate the alleged U.S. consumer exposure to such mentions and foreign tributes. Accordingly, we give them little weight.

Games."[62] In the context of Section 2(a) false association, the Board has considered online articles as evidence of public perception, noting that "[w]hile not considered for the truth of any matters asserted therein, the on-line articles are competent to show that the public has been exposed to the term [at issue] and the meaning the public is likely to associate with the term." *Bos. Athletic Ass'n*, 117 USPQ2d at 1498 (citations omitted). We find that media coverage on Pierre de Coubertin's historical role in the Olympics does not reflect public understanding or perception of PIERRE DE COUBERTIN as the name or identity of Opposer or the Olympic Movement, or a close approximation thereof. We note that much of the media coverage presumes the reader's familiarity with the Olympic Games, but unfamiliarity with Pierre de Coubertin. The publicity refers to and describes Pierre de Coubertin's involvement with the Olympic Movement, holding him out as a historical figure who took the lead in reviving the Olympics.[63] However, the media coverage does not indicate or even suggest that consumers would recognize the name PIERRE DE COUBERTIN as synonymous with the Olympics or Opposer.

Opposer contends that the "matter need not have been used to *identify* the senior user; it just has to be seen as *pointing* to the party."[64] First, we note that the "pointing" language that appears in some Section 2(a) precedents generally addresses the second prong of the false suggestion test – once it is established that the mark is

---

[62] *Id.* (citations omitted).

[63] *See, e.g.*, 26 TTABVUE 15-36; 30 TTABVUE 311-56, 362-72, 377-427, 432-46.

[64] 72 TTABVUE 13 (Opposer's Reply Brief).

the plaintiff's identity, whether the mark would be recognized as pointing uniquely and unmistakably to the plaintiff. *E.g.*, *Hornby v. TJX Cos. Inc.*, 87 USPQ2d 1411, 1426 (TTAB 2008) (because TWIGGY has a dictionary meaning of resembling a twig but was also the nickname of a celebrity, Board "must determine whether consumers would view the mark as **pointing** only to petitioner, or whether they would perceive it to have a different meaning") (emphasis added). Under the first prong, Opposer must establish that PIERRE DE COUBERTIN is its name or identity, or a close approximation thereof.

Even assuming, arguendo, that merely "pointing" to Opposer were the standard, the record indicates that the name points to the historical person Pierre de Coubertin, and that entities other than Opposer lay claim to rights in the name. The joint letter to Applicant from the IOC (part of the same institution as Opposer) and the Fondation states that "the Fondation and Pierre de Coubertin's heirs, represented by the AFC [Association Familiale Coubertin] which specifically safeguards their ancestor's name and the values and rights attached to the name and image of Pierre de Coubertin, ensure, together with the IOC, that their ancestor's patronym and his memory are not prejudiced, notably by means of uncontrolled commercial exploitation which can harm his dignity and the family's honor."[65]

Opposer seeks to challenge the accuracy of this representation, arguing in its Reply Brief that "[t]here is no admissible evidence establishing that the Fondation de

---

[65] 38 TTABVUE 36-37.

Coubertin was actually Pierre de Coubertin's successor."[66] However, the truth of the representation in this joint letter from the IOC and the Fondation is not essential. The letter was sent jointly by the Fondation and an arm of Opposer's own "institution," and the letter acknowledged that PIERRE DE COUBERTIN refers to the individual to whose name certain "values and rights [are] attached" that are protected by his heirs, through the Fondation and another organization identified as "Association Familiale Coubertin."[67] At the very least, the representations in the letter, and the subsequent coexistence agreement between Applicant and the Fondation, demonstrate that there is someone other than Opposer asserting rights in the Pierre de Coubertin name and that Opposer was aware of this assertion of rights because of the IOC's participation in it. *See In re MC S.r.l.*, 88 USPQ2d 1378, 1380-81 (TTAB 2008) (reversing a Section 2(a) false association refusal to register MARIA CALLAS where it was "unclear whether the rights that Maria Callas once possessed in her name or persona devolved to anyone" after her death). That is, the Olympic institution's involvement in the letter reflects its acknowledgment that the Fondation and the Association Familiale Coubertin possess protectable rights in the name at issue.

Ultimately, "the concern in § 2(a) cases involving a false suggestion of a connection, unlike cases under § 2(d) which are concerned with protection of the public from confusion, is protection of persons and institutions from unauthorized

---

[66] 71 TTABVUE 16.

[67] *See* 38 TTABVUE 36-37.

exploitation of their personas." *In re Pedersen*, 109 USPQ2d 1185, 1196 (TTAB 2013), citing *Bridgestone/Firestone Research, Inc. v. Automobile Club De l'Ouest de la France*, 245 F.3d 1359, 58 USPQ2d 1460, 1464 (Fed. Cir. 2001). "A natural person's right to the use of a designation which points uniquely to his or her persona may not be protected under Section 2(a) after his or her death unless heirs or other successors are entitled to assert that right." *MC S.r.l.*, 88 USPQ2d at 1380. In this case, Opposer is not the successor to rights in the name of Pierre de Coubertin, and PIERRE DE COUBERTIN is not Opposer's persona, meaning the mark is not the name or identity of Opposer, or a close approximation thereof. The assertion by the Association Familiale Coubertin and the Fondation of an associational interest in the name (which the Olympic institution has acknowledged) further indicates that the first element of a Section 2(a) false association claim is not satisfied here.

This case is unlike others where the mark in question was not the name of the person or institution at issue, but the public knew the person or institution by the nickname or close approximation of a name or identity in the mark. For example, in *Nieves & Nieves*, the Board held that ROYAL KATE was a close approximation of the identity of Kate Middleton, the Duchess of Cambridge, even though she did not use that term as her name or identity, because the evidence showed that on a widespread basis, "American media uses the term ROYAL KATE to identify Kate Middleton and, therefore, the American public receives media reports identifying Kate Middleton as ROYAL KATE." *Nieves & Nieves*, 113 USPQ2d at 1647. Here, on the other hand, the media evidence shows use of PIERRE DE COUBERTIN to refer to the historical

person, and to describe his role in reviving the Olympic Games, but not as the name or identity of Opposer or of the Olympics.

As another example, in *Buffett*, the Board found that the opposer "[Jimmy] Buffett has attempted, through his commercial licensing program, publicity, and entertainment services, to associate the term 'MARGARITAVILLE' with the public persona of Jimmy Buffett." *Buffett*, 226 USPQ at 430. Significantly, the record included media references to "Jimmy (Margaritaville) Buffett," "The Monarch of Margaritaville" and "The Poet of Margaritaville," as well as testimony from music industry witnesses that the term was "synonymous" with Jimmy Buffett and "almost a nickname of" his. *Id.* The record also included evidence that Jimmy Buffett had licensed "J.B.'s MARGARITAVILLE" for a restaurant and for clothing goods. *Buffett*, 226 USPQ at 430. By contrast, in this case, the record lacks similar evidence that PIERRE DE COUBERTIN would be understood as a nickname of, as synonymous with, or otherwise reflecting the identity of, the Olympic Movement, and instead shows that the name would be understood as a reference to the historical person.

### D. Whether PIERRE DE COUBERTIN Points Uniquely and Unmistakably to the Olympic Games

Next, we find that even assuming, arguendo, that PIERRE DE COUBERTIN were Opposer's name or identity or a close approximation, the mark does not point uniquely and unmistakably to Opposer. Thus, Opposer also fails to satisfy the second prong of the § 2(a) false suggestion test. "[U]nder concepts of the protection of one's 'identity,' ... [a] critical requirement is that the name (or an equivalent thereof) claimed to be appropriated by another must be unmistakably associated with" the

institution in question. *Univ. of Notre Dame*, 217 USPQ at 509. Moreover, this association must be unique. "The protection afforded a name or its equivalent under Section 2(a) is acquired only when the name claimed to be appropriated points 'uniquely and unmistakably' to the plaintiff's 'persona,' that is the personal or trade identity of the claimant." *Bos. Athletic Ass'n*, 117 USPQ2d at 1497 (citing *Buffett*, 226 USPQ at 429); *see also Hornby*, 87 USPQ2d at 1424 ("[T]he name claimed to be appropriated by the defendant must point uniquely to the plaintiff.").

As discussed above, PIERRE DE COUBERTIN names a historical person to whose identity and name certain "values and rights [are] attached" that his heirs, through the Fondation and the "Association Familiale Coubertin,"[68] hold themselves out as entitled to protect. In general, the evidence relating to PIERRE DE COUBERTIN refers to and discusses the late individual.[69] Some of it includes information about his title, education, politics, and interests, and in some cases, his family background and personal life.[70] One article submitted by Opposer notes, "Pierre de Coubertin was primarily a pedagogue and his foremost aim was to reform education. In 1925 he was one of the founders of the World Pedagogical Union."[71] He also is described as the

---

[68] *See id.*

[69] *E.g.*, 26 TTABVUE 15-61; 28 TTABVUE 12-24, 187-98.

[70] *E.g.*, 26 TTABVUE 15 (USA Today article describes how Pierre de Coubertin "had a political agenda" and "was trying to raise the profile for France after its loss in the Franco-Prussian War"); 26 TTABVUE 44 (Bonjour Paris article includes family and personal background, information on his education and travels, and literary accomplishment); 30 TTABVUE 46-48 (Times-Picayune article describes him as "a wealthy Frenchman" whose "physical activities were pretty much limited to riding horses and rowing," and his concern with the "physical degeneracy" of France); 30 TTABVUE 299 (describing Pierre de Coubertin's "passion as an educator").

[71] 30 TTABVUE 1131 (The Sport Journal).

founder of the modern pentathlon.[72] The IOC's own publication about Pierre de Coubertin notes that

> His various publications are estimated to run some 15,000 printed pages, without counting his personal correspondence. This large written output mainly concerns Olympism, sport and education, but also subjects as varied as history, geography, sociology, psychology, or politics.[73]

This evidence emphasizes that Pierre de Coubertin is held out as an individual who had interests and initiatives other than the Olympics, and is not remembered solely for his role in the Olympics. His name is associated with the person, rather than serving merely as a synonym of the Olympic institution.

Even in the context of his role in the Olympics, Pierre de Coubertin is referred to as a person – not as the name or identity of the Olympics. For example, Opposer's Notice of Opposition includes the statement, "Pierre de Coubertin was the founder of the modern Olympic movement and the International Olympic Committee's first president."[74] This corroborates that PIERRE DE COUBERTIN points to the deceased person, rather than pointing uniquely and unmistakably to Opposer or the Olympic Movement. As in *In re Midwest Tennis & Track Co.*, 29 USPQ2d 1386, 1389 (TTAB 1993), concerning the mark OLYMPIAN GOLDE, "due to the variations in possible meaning or connotation for the term [], we cannot say on the basis of the present record that applicant's mark points uniquely and unmistakably to the USOC." *See*

---

[72] *E.g.*, 26 TTABVUE 50; 30 TTABVUE 129, 299, 333, 336.

[73] 30 TTABVUE 42 (IOC Historical Archives "Pierre de Coubertin: overview of the content of the archives concerning his biography, mandates and activities from 1882 to 1999").

[74] 1 TTABVUE 5.

*also Kayser-Roth Corp.*, 29 USPQ2d at 1385 ("Nor can we say on the basis of the record before us that the mark OLYMPIC CHAMPION 'points uniquely and unmistakably' to the United States Olympic Committee inasmuch as that term may as likely point to a contestant representing a country other than the United States in the Olympic games."); *NASA v. Bully Hill Vineyards, Inc.*, 3 USPQ2d 1671, 1676 (TTAB 1987) (the term SPACE SHUTTLE did not point uniquely and unmistakably to NASA); *cf. Schiedmayer Celesta GmbH v. Piano Factory Grp., Inc. and Sweet 16 Musical Props., Inc.*, 2019 USPQ2d 341894, at *7-8 (TTAB 2019) (recognizing that there may be a false suggestion of a connection with multiple persons or institutions where those are "other Schiedmayer family-affiliated businesses") (citing *In re White*, 73 USPQ2d 1713, 1717-18 (TTAB 2004)).

Opposer implies that the name Pierre de Coubertin may point both to the late individual and to the Olympic movement without foreclosing the showing that the name points uniquely to Opposer. Opposer's argument presents parallels with the situation addressed in the Federal Circuit's *Notre Dame* decision. Specifically, the name at issue is of a dead person, and more than one entity or group of persons claims to be associated with the person's name. In *Notre Dame*, the Court held:

> "Notre Dame" is not a name solely associated with the University. It serves to identify a famous and sacred religious figure and is used in the names of churches dedicated to Notre Dame, such as the Cathedral of Notre Dame in Paris, France. Thus, it cannot be said that the only "person" which the name possibly identifies is the University and that the mere use of NOTRE DAME by another appropriates its identity.

*Univ. of Notre Dame*, 217 USPQ at 509.

There are also some commonalities with *Pierce-Arrow*, wherein the opposer acknowledged that the name at issue pointed to a defunct car company and its cars, but claimed that even though it was not the legal successor to the defunct company, it nonetheless should be viewed as the "de facto successor." 2019 USPQ2d 471774, at *18. The Board rejected this claim, noting that the opposer's acknowledgment that the mark pointed to multiple "identities" constituted "reason enough for [the Board] to find that Applicant's mark does not point uniquely and unmistakably to Opposer." *Id.* (citing *Midwest Tennis & Track*, 29 USPQ2d at 1388). The Board concluded that even assuming the defunct car company had name or identity rights, "absent any showing that some person was or is the successor-in-interest to that company, whatever rights the defunct entity had were extinguished when it went bankrupt and ceased to exist … [and] there was no successor to the company who could have passed rights of any type, years later, on to Opposer." *Id.* at *20. Here, Opposer's concession that Pierre de Coubertin refers to a deceased person and that Opposer has not acquired rights to the name from or through the late individual's estate[75] is inconsistent with Opposer's Section 2(a) claim.

Opposer focuses heavily on an argument that by adopting this mark, Applicant intended to falsely suggest a connection with Opposer and the Olympic institution. In particular, Opposer relies on: Applicant's acknowledged awareness of Pierre de Coubertin's involvement with the Olympic institution prior to Applicant's adoption of the mark; Applicant's adoption of the mark despite knowing of the IOC's and

---

[75] 35 TTABVUE 3, 97.

Fondation's foreign registrations for PIERRE DE COUBERTIN or COUBERTIN; and



Applicant's creation of and pursuit of foreign trademark rights in the

logo, which Opposer contends resembles the Olympic rings.[76]

First, we do not find that the evidence dictates a finding that Applicant intended to suggest a connection to Opposer or the Olympic movement. Applicant's awareness of Pierre de Coubertin, the late individual, and his role in the Olympic movement, does not equate to an intent to suggest a connection to Opposer. *Cf. Univ. of Notre Dame*, 217 USPQ at 509 (evidence that an applicant "intended to identify the University," *i.e.*, the opposer, would have been "highly persuasive that the public will make the intended false association"). We do not find credibility problems with Applicant's testimony and evidence regarding the adoption of this mark, nor do Mr. Van Dijk's explanation of the selection of the mark, and rationale for Applicant's willingness to defend in this proceeding, raise red flags. As to the initialism logo, interlocking rounded initials are not uncommon. Overall, in our view, the record as a whole does not persuade us that Applicant intended to falsely suggest that Applicant's goods are connected with Opposer or the Olympic Movement.

Second, to the extent any evidence suggests that Applicant intended to suggest a connection to the late individual Pierre de Coubertin, the situation is similar to that in *Bd. of Trs. of Univ. of Alabama.* In that case, despite an admission by the

---

[76] 67 TTABVUE 29-33 (Opposer's Brief).

applicants that their mark was adopted as an affectionate reference to the houndstooth fedora worn by University of Alabama football coach Bear Bryant, the Board found that the mark as a whole did not closely approximate the identity or persona of Coach Bryant and, thus was not unmistakably associated with him and did not point uniquely to him. *Bd. of Trs. of Univ. of Ala.*, 107 USPQ2d at 2027-28. The Board distinguished prior intent cases on the basis that they involved the exact name or image of the target person or institution, and where, as in this case, the name or image is not Opposer's, the significance of any intent is diminished. *Id.* at 2027. Thus, because PIERRE DE COUBERTIN is not Opposer's name or identity and does not point uniquely to Opposer, any intent by Applicant with regard to Pierre de Coubertin, the deceased person, cannot help establish a Section 2(a) claim for Opposer.

### E. Remaining Elements of Section 2(a) Claim

The parties dispute the proper formulation and application of the remaining two elements of the Section 2(a) claim. The discrepancy between the person named in the mark – Pierre de Coubertin – and the person or institution bringing this claim – Opposer – results in the parties' disagreement over the appropriate analysis of the other elements. The parties contest which to use – Pierre de Coubertin or Opposer – for purposes of assessing the existence of a connection and for purposes of assessing fame. Because of the unusual posture of the claim on this record, and given our findings that Opposer has failed to satisfy the first two elements of the Section 2(a) claim, we consider it unnecessary to resolve these remaining disputed elements. *See*

*Midwest Tennis & Track Co.*, 29 USPQ2d at 1389 (addressing only the first two elements of Section 2(a) false suggestion to find no false suggestion of a connection).

## VI.    Conclusion

Opposer has not demonstrated that Applicant's mark falsely suggests a connection with Opposer. Specifically, Opposer has not satisfied the first two elements of the Section 2(a) false suggestion of a connection test and its Section 2(a) claim thus fails.

**Decision**: The opposition is dismissed.